UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY COLEMAN,

       Petitioner,                              Case No. 12-cv-15048
                                                         Hon. Matthew F. Leitman

v.

CARMEN PALMER,

       Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS (ECF #1) AND DENYING CERTIFICATE OF APPEALABILITY

Petitioner Anthony Coleman ("Petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (*See* the "Petition," ECF #1.) Petitioner is in the custody of the Michigan Department of Corrections pursuant to convictions for conspiracy to commit armed robbery, Mich. Comp. Laws § 750.157a; armed robbery, Mich. Comp. Laws § 750.529; two counts of carrying or possession a firearm during the commission of a felony, Mich. comp. Laws § 750.227b; felon in possession of a firearm, Mich. Comp. Laws § 750.224f; and carrying a concealed weapon, Mich. Comp. Laws § 750.227. Petitioner seeks habeas relief on the grounds that (1) the prosecutor committed misconduct during Petitioner's criminal trial; and (2) the trial court denied him his right to present a defense when it excluded certain evidence. For all of the reasons stated below, the

Court denies the Petition and denies a Certificate of Appealability.

## I. Background and Procedural History

Petitioner's convictions arise from the robbery of a 7-11 store in Saginaw, Michigan. The Michigan Court of Appeals described the circumstances leading to Petitioner's convictions as follows:

> Christopher Hill testified that he formerly worked the third shift at a 7-11 convenience store in Saginaw, Michigan. He related that he was smoking a cigarette outside near his truck during the early morning hours of December 13, 2007, when a tall man – about 6 feet 1 or 2 inches – approached the store's entrance. Hill remarked that the man had a ski-mask covering his face. Hill asked him to remove the mask, but he did not.
>
> Hill said he went into the store shortly after the man entered. The man went to a cooler, got a pop, and then walked to the counter. Hill passed the man on his way to the counter and the man "was acting like he was maybe digging for change to pay for his pop...." So Hill walked passed him to go behind the counter. As he passed by, the man put a gun to Hill's back. After Hill opened the register, the man took the cash – a handful of ones, fives, [and] maybe one ten." The man then left. Hill called the police and he saw officers driving around the area "within the minute" – "they responded very quick."
>
> Matthew McMahon testified that he lived about a block from the 7-11 store involved in the robbery. He was up because he worked third shift and stayed up late. He had opened a second story window and leaned out to smoke a cigarette before going to bed at about 3:30 or 3:45 in the morning. As he smoked, he noticed a car parked across

the street "kind of blocking" his neighbor's driveway. The car was white with a dark cloth top on the back half. McMahon said that the car appeared empty, but then it suddenly started up and the lights came on. The driver pulled away and drove toward Main Street, which was near the location of the 7-11, performed a U-turn, returned and stopped in the middle of the road. McMahon said that the driver got out of the car at about the time another man appeared "running around the corner coming from Main Street towards the car, and I heard the driver saying, 'Come on, come on, come on.' " McMahon thought the other man must have gotten into the car because he did not see the man after the driver got back into the car and drove off.

Officer Douglas Jordan testified that he responded to a dispatch about a robbery that had occurred at a 7-11 store. It was 3:38 in the morning on December 13, 2007. Jordan proceeded to the store, spoke to Hill, and took a description of the man that robbed the store: a black male, 33 to 38 years of age, 6 foot 4, 230 pounds, and wearing a beige ski mask, gloves, sweatpants, and dark jacket. Jordan said he put out the description over his radio.

Detective Matthew Gerow testified that he was a patrolman back in December 2007 and that he was patrolling Saginaw's southwest side when he heard a dispatch concerning an armed robbery at a 7-11 store. Gerow said that he drove to the area and began to circle the nearby blocks "listening for dogs barking or chain link fence rattling, any sign of movement in the blocks there." As he was driving down one street, he heard someone shout "Officer, Officer." Gerow looked up and saw a man leaning out of a second story window. The man asked him if "something had happened" and Gerow asked why he asked.

McMahon testified that, five to seven minutes after the man in the white car drove off, he saw a police officer driving down his street with no lights on. He yelled to the officer and told him about the white car and the man running from Main Street. Gerow said that the man in the window told him that he "just seen a black guy wearing all dark clothing with a knit hat jump into a vehicle that ... sped off." Gerow took a description of the vehicle and put it out "over the police radio."

Officer Anthony Teneyuque testified that he was driving toward the 7-11 store after hearing the dispatch concerning an armed robbery. He said he heard the description of the suspect – a tall, heavy, black man in dark clothing – and of the white car with the cloth top. Teneyuque stated that there were no cars on the roads at the time. As he was crossing the Center Street Bridge on the way to the 7-11 store, he noticed a white car with a cloth top being driven in the opposite direction. He decided to turn around and speed up to investigate the white car. He stopped the car and walked up to the driver's side door.

Teneyuque said that Coleman was the driver and that there was no other person in the car. He asked Coleman to get out, which Coleman did, and then explained that he was investigating an armed robbery. He also asked Coleman if he could search his car and Coleman told him that he could. For reasons of safety, Teneyuque placed Coleman in the back of his patrol car before he searched Coleman's car. He said that he did not find anything in the car and, because Coleman did not match the description of the suspect, he thought there was no further reason to detain him. However, when he went to report the stop by radio, he stood near the white car's trunk and heard a noise coming from it. He opened the

4

trunk and discovered a large man, who was later identified as Corey Harper, lying inside in a half-fetal position. Harper was wearing dark clothing and clutching a handful of cash. He later found gloves and a handgun in the trunk. Teneyuque noted that the stop occurred at 3:46 a.m.

Coleman testified on his own behalf. Coleman said that, on the morning at issue, he was out at a friend's house and got a call that another friend's home "had got shot up." He decided to go visit this friend at about two in the morning to see if he was ok. However, he was having trouble finding the home where this friend went to stay after the shooting, so he was driving up and down the road. At that time, Harper came running up to him and related that someone was trying to kill him. Coleman said that he knew Harper from the neighborhood. Coleman testified that he decided to help Harper; so he put him in the trunk. Coleman explained that Harper was "too big" and he was afraid that whoever was trying to kill Harper might "shoot the whole car up", if they saw Harper in the car. Coleman said that he did not see Harper with gloves or a gun. He said he was merely trying to take Harper back to their neighborhood, where he would be safe, when an officer pulled him over.

Coleman admitted that he did not flag down an officer to help with Harper's situation. He stated that he did not seek an officer's help because "they never help us." He also admitted that he did not tell the officer who pulled him over that Harper was in the trunk. Teneyuque testified that he asked Coleman why he did not reveal that Harper was in the trunk and Coleman responded that he "didn't want to get into Mr. Harper's business." Coleman testified that he did not tell Teneyuque about Harper because he knew that Harper was in a gang and he feared retaliation. He also explained that people from his neighborhood "don't talk to police."

5

*People v. Coleman*, No. 299517, 2011 WL 4950003 at *2-3 (Mich. Ct. App. Oct. 18, 2011).

Petitioner was tried twice in the Saginaw County Circuit Court. Petitioner's first trial ended in a mistrial after the jury could not reach a verdict. At the second trial, the jury found Petitioner guilty of conspiracy to commit armed robbery, armed robbery, two counts of felony firearm, felon in possession of a firearm, and carrying a concealed weapon. On October 15, 2009, the state trial court sentenced Petitioner to 25 to 50 years in prison for the armed robbery, conspiracy to commit armed robbery, being a felon-in-possession, and carrying a concealed weapon convictions, all to be served concurrently. The trial court also sentenced Petitioner to two years' imprisonment for each of the felony-firearm convictions, to be served concurrently with one another but prior to the other four sentences.

Petitioner filed an appeal of right in the Michigan Court of Appeals, raising these claims: (i) prosecutorial misconduct; (ii) that the trial court denied him the right to present a defense when it excluded evidence he intended to introduce to show that he had a legitimate source of income; and (iii) that the trial court denied him the right to present a defense when it excluded evidence related to his learning disability. The Michigan Court of Appeals affirmed Petitioner's convictions. *See*

*Coleman*, 2011 WL 4950003.

Petitioner then filed an application for leave to appeal in the Michigan Supreme Court, raising the same claims he raised in the Michigan Court of Appeals. The Michigan Supreme Court denied leave to appeal. *See People v. Coleman*, 491 Mich. 888 (Mich. 2012).

Petitioner thereafter filed the pending habeas Petition. (*See* ECF #1.) Petitioner raises these claims:

> I. Petitioner was denied his right to due process by prosecutorial misconduct that occurred during closing argument;
>
> II. Petitioner was denied his constitutional right to present a defense when the trial court excluded defense evidence for a discovery violation, regarding Petitioner's sources of income; and
>
> III. Petitioner was denied his constitutional right to present a defense when the trial court excluded evidence, due to a discovery violation, regarding Petitioner's learning disability.

## II. Governing Legal Standard

Review of the Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under the AEDPA, a state prisoner is entitled to a writ of habeas corpus only if he can show that the state court's adjudication of his claims –

>(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). "[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413). Furthermore, "[i]n order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have

been 'objectively unreasonable.'" *Id.* at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409. In other words, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, —, 131 S. Ct. 770, 789 (2011), (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Finally, a federal habeas court must presume the correctness of state court factual determinations. *See* 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption only with clear and convincing evidence. *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

### III. Discussion

#### A. Prosecutorial Misconduct Claim

Part of Petitioner's defense at trial was that he had no motive to commit a robbery for a small amount of money because earned a sufficient income working in lawn care and snow removal for a realtor. To support this defense, Petitioner sought to introduce purported "receipts" of the payments he received. But "the trial court … precluded the admission of the receipts, which were apparently hand written by Coleman's wife, because Coleman did not reveal the existence of the receipts until just before the [second] trial." *Coleman*, 2011 WL 495003 at *3.

Petitioner now argues that he is entitled to habeas relief because the prosecutor wrongly took advantage of this evidentiary ruling when he (the prosecutor) said in his rebuttal argument that Petitioner had failed to corroborate his claim that he was employed at the time of the robbery. The prosecutor argued to the jury as follows:

> Why don't you tell your probation officer you've been working? Because you haven't been? Can you really buy the argument he wouldn't say that because that was October and the grass cutting is over? Aren't you supposed to be trying to impress your probation officer with all the things you're doing right? But, no, he doesn't bring it up at all. As a matter of fact, he tells him not working, doing odd jobs, yet we hear about him working for some guy, Wesley Stone I think he said, who mails him checks for lawn work. He's in Bay City. Remember? Where's Wesley? Where's the guy that's writing the checks? Where are the checks? Where's anything?

*Id.* at *4.

Petitioner asserts that the prosecutor knew that corroborating evidence existed, but that the evidence was excluded on a procedural ground.

The "clearly established Federal law" relevant to a habeas court's review of a prosecutorial misconduct claim is the Supreme Court's decision in *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). *See Parker v. Matthews*, — U.S.—, 132 S. Ct. 2148, 2153 (2012). In *Darden*, the Supreme Court held that a "prosecutor's improper comments will be held to violate the Constitution only if they 'so

infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "To constitute a denial of due process, the misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial." *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000) (quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997)). This standard is not easy to satisfy. Indeed, the Sixth Circuit "has been reluctant to grant habeas petitions based on improper prosecutorial statements at closing argument." *Wilson v. Mitchell*, 250 F.3d 388, 398 (6th Cir. 2001).

When confronted with this issue on Petitioner's direct appeal, the Michigan Court of Appeals reasoned, in relevant part:

> It is ... well-settled that, once a defendant presents a particular theory to the jury for consideration, the prosecutor can comment on the defendant's failure to present evidence to support that theory. *See People v. Fields*, 450 Mich. 94, 115–116; 538 N.W.2d 356 (1995).
>
> Here, Coleman's defense was that he was the victim of circumstance. To bolster this theory, he testified that he had no motive to commit a robbery for a few dollars because he was "well off" and working in lawn care and snow removal. ... [W]hen Coleman presented evidence that he had no motive to commit the robbery, the prosecutor had every right to comment on the weakness of Coleman's evidence showing a lack of motive. *Fields*, 450 Mich. at 115–116. As can be seen from the remarks about which Coleman complains, the prosecutor emphasized that the evidence that Coleman never told his parole officer about his new employment, despite the fact that one would presumably want one's parole officer to be aware of such an important fact. The prosecutor also noted – in passing – that Coleman

11

had not called his purported employer to the stand or offered any checks into evidence that would show how much he had earned. These remarks were all proper; Coleman was in a better position to reveal who his employer was and to call him to the stand to corroborate his employment claims. But he failed to call Stone to the stand. Coleman presumably also had access to the checks or copies of the checks from his employment, but did not produce them. Indeed, Coleman failed to reveal his employment in lawn care and snow removal during discovery, during his preliminary examination, during his last trial, or before the present trial. Given the testimony from his parole officer, the prosecutor could properly argue that the reason Coleman did not produce Stone or Stone's checks was because he was not actually working for Stone. *Id.*

In addition, the remarks cannot be said to exploit the trial court's decision – as Coleman claims on appeal – to prohibit him from presenting "employment corroboration" evidence. This is because the trial court made no such prohibition; it precluded him from presenting newly "discovered" receipts drawn up by his wife, because he had not disclosed the receipts – or indeed his employment history – until the second day of the present trial, which the court determined amounted to a discovery violation. And, contrary to Coleman's claim at trial, the prosecutor did not directly comment on his failure to produce "receipts." Rather, the only comment that could even be considered improper was the prosecutor's closing comment, "Where's anything?" This last remark might – in a stretch – be considered an improper reference to Coleman's failure to produce the precluded receipts. But it can just as easily be understood as a summation of the prosecutor's statements immediately preceding that remark; namely, that Coleman did not call Stone to the stand and did not present copies of Stone's checks to show that he was actually "well off" and, therefore, did not need to commit a robbery to get money. When this isolated remark is considered in light of Coleman's trial counsel's closing argument and the evidence adduced at trial, we cannot conclude that it was improper. . . .

> Even if this two-word comment could be considered improper, we do not agree that it deprived Coleman of a fair trial. *Id*. at 266–267. The evidence that Coleman knowingly participated in Harper's robbery of the 7-11 store – although circumstantial – was quite strong. Coleman's convoluted explanation of the circumstances that innocently explain how Harper came to be found in his trunk during a traffic stop shortly after an early morning robbery is so far-fetched that it actually served to highlight the strength of the circumstantial evidence tending to show that he agreed to provide Harper with the transportation for the robbery. . . . [A]nd the fact that Coleman had employment did not, in any event, negate the motive of pecuniary gain – it is entirely plausible that Coleman would participate in the robbery to obtain additional money despite being "well off." Given that Coleman's motive theory was weak, that the evidence tended to show that he was not actually working despite his testimony to the contrary, and that the purportedly improper comment was quite minor, even if improper, the comment does not warrant relief.

*Coleman*, 2011 WL 4950003 at *4-5.

The Michigan Court of Appeals' holding was detailed, persuasive, and not an unreasonable application of *Darden.* It was not out of bounds for the prosecutor to identify the lack of evidence supporting Petitioner's no-motive theory. And the complained-about statement was an isolated remark in a rebuttal argument, not the central theme of the prosecution's closing argument. Moreover, as the court properly pointed out, the prosecutor's argument that Petitioner failed to provide corroboration for his claimed employment did not necessarily reference the absence of receipts.

Finally, the Michigan Court of Appeals' conclusion that any prosecutorial misconduct amounted to harmless error was not unreasonable. Moreover, Petitioner has not shown that the purported error of the trial court "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. U.S.*, 328 U.S. 750, 776 (1946)). As described above, the complained-of statement was ambiguous, was only a small part of the prosecutor's rebuttal argument, and there was other evidence of Petitioner's guilt. And Petitioner could have attempted to corroborate his testimony that he was employed in other ways, such as calling additional witnesses to confirm his employment. But Petitioner did not do so, and he has not claimed that he was prevented from doing so. Moreover, the trial court instructed the jury that Coleman was presumed innocent and that the prosecutor had the burden of proving Coleman's guilt beyond a reasonable doubt, which mitigated any improper inference that may have been taken from the prosecutor's rebuttal argument. Petitioner is not entitled to habeas relief on this ground.

### B. Right to Present a Defense

In his second and third claims for habeas relief, Petitioner argues that two of the trial court's evidentiary rulings denied him his right to present a defense. Specifically, Petitioner argues that the trial court violated his right to present a

defense when the court excluded the purported work receipts from evidence and when it excluded testimony related to his learning disability.

The right of a defendant to present a defense has long been recognized as "a fundamental element of due process of law." *Washington v. Texas,* 388 U.S. 14, 19 (1967). It is one of the "minimum essentials of a fair trial." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). Because criminal defendants are guaranteed a "meaningful opportunity to present a complete defense," courts cannot exclude defense evidence under evidentiary rules that "serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote." *Holmes v. South Carolina*, 547 U.S. 319, 325-26 (2006).

In determining whether the exclusion of evidence infringes upon a weighty interest of the accused, the question is whether the defendant was afforded "'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986), (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). The prosecutor's case must "encounter and 'survive the crucible of meaningful adversarial testing.'" *Id.* at 690-691 (1984), (quoting *United States v. Cronic*, 466 U.S. 648, 656 (1984)). But the Supreme Court has emphasized that "the Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." *Marshall v. Lonberger*, 459 U.S.

422, 438 n. 6 (1983).

Petitioner argues that the trial court's exclusion of the receipts prevented him from showing that he had ample funds and thus no motive to commit the robbery. The Michigan Court of Appeals considered and rejected this argument:

> Although a defendant has a constitutional right to present a defense, that right is not absolute; the defendant must still comply with the rules and statutes designed to ensure that the trial is fair. *Yost,* 278 Mich.App at 379. Here, Coleman waited until the second day of his second trial to reveal the existence of the receipts. And, despite his claim that he could not have revealed them earlier because he had thought them lost, he also failed to disclose the existence of this employment prior to the present trial. That is, it was not just that he failed to disclose the existence of the receipts, he also failed to disclose that he worked for a man named Stone performing lawn care and snow removal prior to this trial. By failing to disclose these claims, he prevented the prosecutor from investigating this employment prior to trial. Further, the receipts were apparently hand written by Coleman's wife. Hence, in order to adequately challenge the receipts, the prosecutor would have required time to try and locate Stone, investigate Coleman's bank accounts, and ultimately depose Coleman's wife. As such, the late production of these receipts was highly prejudicial to the prosecution and could likely only be remedied through an adjournment of the trial. Likewise, the receipts had limited relevance to show that Coleman had income during the period at issue and Coleman still had the opportunity to present other less prejudicial evidence tending to show that he had a source of income. Given these considerations, we cannot conclude that the trial court abused its discretion when it

>  prohibited the use of these receipts. *Id.*

*Coleman*, 2011 WL 4950003 at *6.

The Michigan Court of Appeals reasonably concluded that the trial court's exclusion of the receipts was a measured response to a discovery violation that otherwise would have prejudiced the prosecution. And, as discussed above, Petitioner could have introduced evidence of his income in other ways, by, for example, calling additional witnesses to corroborate his employment. The receipts were simply not indispensable to Petitioner's defense. Moreover, a jury would have had plenty of reasons to question the validity of both the receipts and Petitioner's assertion he was employed. Petitioner could not initially remember the same of the realtor who purportedly employed him, he admitted that he never told his probation officer that he was employed, and the receipts Petitioner wanted admitted were drafted by Petitioner's wife. The exclusion of the receipts did not deprive Petitioner of his right to present a defense.

Petitioner also argues that his right to present a defense was violated by the trial court's exclusion of evidence of his learning disability. The Michigan Court of Appeals rejected this argument as well:

>  From the record, it is not clear that the trial court actually precluded Coleman from testifying about his learning disability for the purpose of explaining his inability to

remember the name of the man that he worked for. Rather, the court seemed to preclude testimony that he had a learning disability to show that he was not mentally competent in a broader sense, which was proper. See *Yost,* 278 Mich.App at 353–355. The court was also plainly focused on Coleman's proclivity for interjecting improper and non-responsive commentary on the evidence, the court's rulings, and the prosecutor's conduct. In any event, to the extent that the trial court might have erred by precluding Coleman from offering testimony about his learning disability for a proper purpose, see *id.* at 355 (stating that a defendant might properly present evidence of his or her limited intellectual capabilities for a purpose other than to negate specific intent), we cannot conclude that such an error warrants relief.

Coleman's trial counsel presented evidence that Coleman could not read or write, which tended to show that he some sort of learning deficiencies and also tended to explain why he might not be able to recall the names of streets or the name of the man for whom he worked. Thus, any additional testimony concerning a clinical learning disability would have only marginal additional relevance toward explaining his mnemonic shortcomings. Moreover, on the following day's testimony, Coleman testified that he had difficulty remembering names and that that difficulty was related to his inability to read and write. He also testified that he is easily confused. Finally, he testified that he refreshed his recollection and recalled the name of the realtor for whom he performed lawn work, which was Wesley Stone. Consequently, the trial court actually allowed Coleman to present significant testimony concerning his limitations. Given this, we cannot conclude that any error in the trial court's decision to limit Coleman's testimony about his learning disability prejudiced his trial. See

> *People v. Lukity,* 460 Mich. 484, 495–496; 596 NW2d 607 (1999).

*Coleman*, 2011 WL 4950003 at *7.

At trial, Petitioner was permitted some testimony on the subject of his learning disability. Any limits imposed by the trial court on this subject were reasonable and regarded only marginally relevant testimony. Thus, the Michigan Court of Appeals' decision that Coleman was not denied his right to present a defense was not contrary to or an unreasonable application of Supreme Court precedent.

### IV. Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal of this Opinion and Order may not proceed unless a certificate of appealability (a "COA") is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 Proceedings now requires that the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). A petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues

19

presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (citation omitted). In this case, the Court concludes that reasonable jurists would not debate the conclusion that the Petition fails to state a claim upon which habeas relief should be granted. Therefore, the Court will deny a certificate of appealability.

## V. Conclusion

Accordingly, **IT IS ORDERED** that the Petition for a Writ of Habeas Corpus (ECF #1) is **DENIED** and the matter is **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **DENIED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: March 5, 2015

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 5, 2015, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113